[Crim. No. 18241. In Bank. July 14, 1975.]

In re BERNARD A. SHAPIRO on Habeas Corpus.

**COUNSEL**

Bernard A. Shapiro, in pro. per., and John T. Weld, under appointment by the Supreme Court, for Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Brian F. Taugher and Richard L. Adams, Deputy Attorneys General, for Respondent.

**OPINION**

**MOSK, J.**—Seeking a writ of habeas corpus petitioner contends that a California detainer has been improperly placed against him at his present place of confinement, the United States Penitentiary at Steilacoom, Washington (McNeil Island). He grounds his claim on the failure of the Adult Authority to accord him parole revocation hearings as mandated by *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593].

In 1969 petitioner was convicted of grand theft involving the possession of stolen credit cards and was sentenced to prison for the term prescribed by law. (Pen. Code, § 484e, subd. (4).) On April 4, 1972, petitioner was released on parole. On December 12, 1972, petitioner was arrested for selling 29 ounces of cocaine to an undercover federal narcotics officer.[1] He was booked into Los Angeles County jail for this offense and a California parole hold was placed against him. On January 3, 1973, petitioner's parole was tentatively suspended pending the outcome of the federal charges. On March 6, 1973, petitioner pleaded guilty in federal court and was given a four-year sentence to run concurrently with his prior California sentence. He was thereafter transported to McNeil Island to begin his federal term.

On March 30, 1973, the Adult Authority formally suspended parole and ordered petitioner returned to prison for revocation proceedings.[2] An arrest warrant was then forwarded to McNeil Island with a request that California authorities be notified 60 days prior to petitioner's release. The federal officials treated the filing of the warrant and the request for notice as a detainer against petitioner.

Petitioner contends the failure to accord him either a preliminary or final *Morrissey* hearing is a denial of due process which compels dismissal of the parole violator warrant and his restoration to California parole status. The Attorney General responds there is no right to *Morrissey* hearings in the case at bar on the grounds that (1) no prerevocation hearing was required because the facts in question occurred prior to our decisions in *In re Valrie* (1974) 12 Cal.3d 139 [115 Cal.Rptr. 340, 524 P.2d 812], and *In re La Croix* (1974) 12 Cal.3d 146 [115 Cal.Rptr. 344, 524 P.2d 816], and (2) no final revocation hearing was required because *Morrissey* does not extend to parolees convicted of crimes committed while on parole and incarcerated in another jurisdiction.

I

At the outset we comment on the source of our habeas corpus jurisdiction in the case of a federal prisoner. Obviously there is no power

---

[1]A later search of petitioner's apartment revealed an additional 2.2 pounds of cocaine and 3 pounds of heroin. Accordingly, the Adult Authority regards petitioner as a large-scale trafficker.

[2]There is of course no power in the State of California to compel the return of petitioner for his revocation hearing. The Interjurisdictional Agreement on Detainers embodied in Penal Code section 1389 applies only to detainers based on "untried indictments, informations or complaints," and not to parole violation detainers.

in this court to affect his term or conditions of confinement within a federal penitentiary. This petition does not, however, request us to direct a writ to federal officials in the State of Washington, but to officials of the Adult Authority in California. It is the existence of the detainer initiated in California which is causing the petitioner deleterious consequences at McNeil Island, and petitioner correctly concludes that if the parole violator warrant is invalid the detainer itself will be removed.[3]

In terms of standing it is clear that the lodging of a detainer results in a cognizable detriment to petitioner. Petitioner enumerates the following purported adverse consequences of the detainer: (1) it precludes his application for choice work duty such as "camp assignments" at which "camp good time" can be earned; (2) it results in ineligibility for furloughs for work or school purposes and (3) ineligibility for federal "parole to the community"; (4) it disrupts rehabilitative efforts since he has no way of ascertaining the ultimate length of his term if and when California executes the outstanding warrant. In addition, and perhaps most importantly, the failure of the Adult Authority to either revoke or reinstate parole has denied petitioner the benefit of concurrence which the federal sentence envisaged. As long as parole is merely "suspended" petitioner is considered a technical fugitive from justice while at McNeil Island, and no part of the time during which he is a fugitive from justice shall be part of his term. (Pen. Code, § 3064; cf. *In re Yutze* (1968) 69 Cal.2d 389 [71 Cal.Rptr. 673, 445 P.2d 289]; *In re Pearce* (1974) 40 Cal.App.3d 399 [115 Cal.Rptr. 222].)[4]

[3]The detainer also acts as a limited type of "custody" to which habeas corpus may be directed. As stated by the United States Supreme Court in *Braden* v. *30th Judicial Circuit Court of Ky.* (1973) 410 U.S. 484, 489, footnote 4 [35 L.Ed.2d 443, 449, 93 S.Ct. 1123]: "Since the Alabama warden acts here as the agent of the Commonwealth of Kentucky in holding the petitioner pursuant to the Kentucky detainer, we have no difficulty concluding that petitioner is 'in custody' for purposes of [federal habeas corpus jurisdiction]." (See also *United States* ex rel. *Meadows* v. *State of New York* (2d Cir. 1970) 426 F.2d 1176, 1179-1183.)

[4]Respondent has submitted with its return the affidavit of petitioner's caseworker at McNeil Island in which it is claimed that petitioner is suffering no adverse consequences from the filing of this detainer. The dissent, noting that the affiant was "under oath," would conclude from this single document that there is not a sufficient loss of liberty to trigger the demands of *Morrissey*. It is unclear whether the dissent is arguing that the alleged lack of deleterious consequences deprives us of habeas corpus jurisdiction; this would be a curious position in light of the Attorney General's concession that "this Court has jurisdiction over the limited custodian of petitioner by way of the detainer, and therefore has habeas corpus jurisdiction in this case." It must then be that the dissent feels that the lack of *Morrissey* hearings and consequent detainer result in no loss to petitioner. But whether or not petitioner's claims of detriment—also made "under oath"—are factually accurate, the failure to provide revocation hearings, as we shall

## II

The merits of petitioner's claim begin with a consideration of *Morrissey*. There the Supreme Court held that the Fourteenth Amendment requires the states to provide two separate hearings prior to parole revocation: first, a reasonably prompt, informal "prerevocation" hearing near the place of the alleged violation to determine if there is probable cause to believe a parole condition has been violated (408 U.S. at pp. 484-487 [33 L.Ed.2d at pp. 496-498]); and secondly, a more formal "revocation" hearing which includes notice to the parolee of the charges and evidence against him, the opportunity to personally appear, present evidence and confront and cross-examine witnesses, a neutral and detached tribunal, and a written statement by the factfinder of the reasons for revocation. (*Id.* at pp. 487-490 [33 L.Ed.2d at pp. 497-500].)

The question whether either or both *Morrissey* hearings are required where the parole violation charged is the commission of a separate criminal offense is one we considered in *In re Law* (1973) 10 Cal.3d 21 [109 Cal.Rptr. 573, 513 P.2d 621], and *In re Valrie* (1974) *supra*, 12 Cal.3d 139. In *Law* we determined that the preliminary hearing or trial itself may serve as the first *Morrissey* hearing as long as the criminal proceeding occurs promptly after the commission of the charged offense and the parolee-defendant is given notice of its dual purpose. (10 Cal.3d at p. 28.) In *Valrie* we reiterated the holding of *Law* and squarely determined that the requirement of a prerevocation hearing remains even when the alleged parole violation is also charged as a new crime,

explain in more detail herein, have serious adverse effects on petitioner.

The most obvious effect flows from the fact that petitioner is presently in suspended parole status and receiving no credit on his California term. Until revocation hearings are held there is no possibility of the California and federal terms running concurrently. Once revocation hearings are held, the Adult Authority may decide to reinstate parole notwithstanding that the parole violation has resulted in a new criminal conviction. (See *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778, 790 [36 L.Ed.2d 656, 666, 93 S.Ct. 1756].) The dissent wholly disregards this possibility.

But even if petitioner is unsuccessful at his *Morrissey* hearing and parole is revoked, petitioner could then request of the United States Attorney General that a California institution be designated as the place of service of the federal sentence, thus allowing petitioner to achieve the benefit of concurrence which the federal judge recommended. Until petitioner is ordered returned to prison, as opposed to being returned for revocation hearings, such a designation would be impossible and a request premature.

The dissent observes that "No such designation [of California institution by the Attorney General] has been made here." The reason there has been no designation is, of course, because there has been no request; and the reason there has been no request is that there has been no revocation hearing. To urge that there should be no revocation hearing because there has been no designation is manifestly circular reasoning.

either by state or federal authorities. (See also *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778, 782 [36 L.Ed.2d 656, 661-662, 93 S.Ct. 1756].)

To date we have not had occasion to consider whether a final revocation hearing is required when the parole violation charged is conviction of a separate offense and the parolee is being held by another sovereign. To resolve petitioner's claim in the case before us we must decide that question as well as whether the failure to provide a prerevocation hearing has resulted in such prejudice as to justify removing the detainer and restoring petitioner to parole status.

## III

The Attorney General concedes "To the extent that *Morrissey* requires a prerevocation hearing while criminal proceedings are pending on conduct which is alleged to constitute a parole violation, petitioner should have been given a prerevocation hearing." We interpret this somewhat tautological statement as a concession that such a hearing was required here. However, the events in question took place prior to our decisions in *Valrie* and *La Croix,* during which period the Adult Authority took the position that a prerevocation hearing was not required when an alleged parole violation was also charged as a new crime. We noted in *La Croix* that this attitude was based on a good faith misinterpretation of *Morrissey* (12 Cal.3d at p. 155, fn. 7), and rejected the contention that in all cases of wrongful denial of a timely prerevocation hearing the parolee must be restored to parole status.

The test adopted in *La Croix* for determining whether denial of a hearing resulted in prejudice was the harmless error standard, i.e., " 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt' " (P. 154 of 12 Cal.3d, quoting *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) In applying this test we held: "It is manifest that in the instant case petitioner cannot establish that he was prejudiced by the denial of such a timely prerevocation hearing. He does not suggest any manner in which he can successfully challenge the fact of his post-parole conviction of driving while under the influence of intoxicating liquor and the fact that such conviction constituted a violation of a condition of parole. He presents nothing which even suggests that all factual issues to be presented at the summary prerevocation hearing to which he was entitled would not necessarily have been resolved against him . . . . He thus fails completely to demonstrate prejudice . . . and we can declare without

reservation that the denial in this case was harmless beyond a reasonable doubt. . . ." (Pp. 154-155 of 12 Cal.3d.)

■ Similarly, petitioner in the present case makes no showing that he was prejudiced by denial of a timely prerevocation hearing. The sole purpose of this hearing would have been to determine if there was probable cause to believe he had violated a condition of parole. In view of the sale of contraband to the agent, the discovery of additional contraband in the home, and the ultimate guilty plea, it is evident the result of this hearing would have been adverse to petitioner. Petitioner makes no suggestion that the disposition would have been otherwise, but contends only that denial of a hearing per se entitles him to relief. We rejected that contention in *La Croix,* and we likewise conclude here that the denial of a prerevocation hearing was harmless error beyond a reasonable doubt.

## IV

We next consider whether *Morrissey* requires a final revocation hearing where the parolee has been convicted of a new offense and is incarcerated in another jurisdiction. As suggested above, the question is far from academic. If petitioner were allowed such a hearing and were able to prevail, the parole violator warrant and attendant detainer would be dissolved and parole status would be reinstated. This would result in a dual benefit: (1) petitioner would then be eligible to participate in rehabilitative programs at McNeil Island, and (2) the federal and California terms would run concurrently.

While it appears unlikely in view of the gravity of the parole violation that the Adult Authority would see fit to reinstate parole, nevertheless there is a significant benefit to petitioner should parole be revoked. Petitioner could then request of the federal authorities that a California state penal institution be designated as the place of service of the federal sentence, and thus achieve the benefit of concurrency. At present such a request would be premature because the Adult Authority has held no revocation hearing and thus has made no decision that petitioner is to be returned to prison.

If petitioner remains in suspended status or is unable to convince the United States Attorney General to designate a California institution the net result is that the federal sentence will be consecutive to the state term, notwithstanding that the federal judge recommended concurrence. "The Attorney General of the United States is given the right to designate where a sentence shall be served. 18 U.S.C.A. § 4082(a). Thus

the recommendation of the District Court that [the] original sentence run concurrently with the state sentence then being served in a state prison was surplusage and could have been disregarded by the Attorney General. [Citation.]" (*Hash* v. *Henderson* (8th Cir. 1967) 385 F.2d 475, 477.)

Our concern here is not, of course, whether the United States Attorney General will follow the recommendation of the federal judge and designate a California institution. However, as noted, unless and until the Adult Authority resolves his parole status petitioner would be unable even to make such a request of the Attorney General.

The precise issue thus comes into focus: can petitioner compel the Adult Authority to hold a revocation hearing and remove him from the limbo in which he finds himself with respect to the state term? While the question is one of first impression in this court, it has been considered by various federal courts with mixed results.

The leading authority denying the right to such a hearing is the decision of the Fifth Circuit in *Cook* v. *United States Attorney General* (5th Cir. 1974) 488 F.2d 667. There the court held that a federal parole board need not grant a revocation hearing to a parolee at the commencement of a new federal sentence where the parole violator warrant was unexecuted pending completion of the intervening sentence. The court considered the contention that the deferral of revocation resulted in restrictions flowing from the lodging of a detainer, but concluded: "We do not close our eyes to the fact that Appellee may have been disadvantaged in certain respects by the deferral of the revocation hearing but we are unable to conclude that the disadvantage constitutes such a grievous loss—in due process terminology—as to require the hearing be held prior to service of the intervening sentence or to permit the intrusion by a Court into this highly discretionary activity." (Fn. omitted.) (*Id.* at p. 673; accord, *Small* v. *Britton* (10th Cir. 1974) 500 F.2d 299.)

By contrast, the Eighth Circuit in *Cooper* v. *Lockhart* (1973) 489 F.2d 308, has held that revocation hearings are required even though the parolee is incarcerated in another state under an intervening conviction. Thus *Cooper,* unlike. *Cook,* was squarely presented with the multiple jurisdictional problem. The court concluded that "the special conditions of . . . confinement [in Arkansas] automated by the filing of the [Michigan] detainer must be discontinued in the event that Michigan, upon reasonable notice being given, does not request that [the prisoner]

be made available for prompt disposition of the parole revocation proceeding." (*Id.* at p. 315.)

At the district court level the decisions have generally required revocation proceedings after an intervening conviction. The United States District Court for the District of Columbia has on three occasions recognized this right. (*Sutherland* v. *District of Columbia Board of Parole* (1973) 366 F.Supp. 270; *Jones* v. *Johnston* (1974) 368 F.Supp. 571; *Fitzgerald* v. *Sigler* (1974) 372 F.Supp. 889; contra, *Thomas* v. *United States Board of Parole* (D.Kan. 1973) 354 F.Supp. 273.) In *Sutherland* the court stated: "It has long been recognized in this Circuit that 'the issuance of a violator warrant triggers a process which, as a matter of fundamental fairness, must be pursued with reasonable diligence and with reasonable dispatch.' [Citation.] A prompt revocation hearing is essential because delay may result in the loss of essential witnesses or documentary evidence and the continuation of unnecessary incarceration or other limitations on personal liberty. . . . Not only might mitigating evidence be lost during the years of intervening incarceration, [citation] but the parolee could be arbitrarily deprived of the opportunity to have his reincarceration, if ordered, run concurrently with the remainder of his intervening sentence. The maintenance of a detainer against an inmate whose parole will never actually be revoked has other undesirable effects, triggering an unnecessary loss of prison privileges and hampering rehabilitation by placing the parolee's future into a state of prolonged uncertainty." (366 F.Supp. at pp. 271-272.)

In the most recent consideration of the question the United States District Court for the Northern District of Georgia has brought into question the continuing vitality of *Cook* in the Fifth Circuit. (*Pavia* v. *Hogan* (N.D.Ga. 1974) 386 F.Supp. 1379.) *Pavia* recognized that Fifth Circuit cases such as *Cook* had countenanced deferral of revocation hearings until completion of service of the intervening sentence but regarded that view as no longer tenable in view of the extension of due process to prisoners in *Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963]. *Cook* was also distinguished on the ground that that case was concerned with provisions of federal parole law, whereas the jurisdiction issuing the detainer in *Pavia* was the State of New York, which did not require that an alleged parole violator be taken and returned before a right to a revocation hearing is triggered. Accordingly the court ruled, "due process requires that the parole revocation hearing be held within a reasonable time after the parole violator is taken into custody to serve the sentence on his intervening

conviction." (386 F.Supp. 1386; accord, *Peele* v. *Sigler* (E.D.Wash. 1974) 392 F.Supp. 325.)

The foregoing federal cases were in the main concerned with the mirror image of the issue at bar, i.e., whether the custodial jurisdiction could continue the punitive effects of a detainer in the absence of a revocation hearing by the jurisdiction issuing the detainer. Some, like *Cook* and *Sutherland,* did not involve a multiple jurisdiction issue.[5] However, all considered the fundamental question of the parameters of *Morrissey* after an intervening incarceration; but as has been described, the issue nevertheless remains unsettled.

Our own view of the matter comports with that of *Cooper* and *Sutherland.* A final decision on parole is particularly crucial to a parolee whose intervening sentence was, as here, ordered to be concurrent with the prior term. But even where this has not occurred, we are not prepared to say that conviction of a crime committed while on parole will without exception result in revocation. If that were a proper conclusion the Supreme Court in *Morrissey* and *Gagnon* would have specifically excepted from the requirement of a hearing those parolees whose violations were cemented in a final judgment of conviction. But *Gagnon* expressly dealt with this question and concluded that a hearing, and perhaps even counsel, are necessary since a parolee or probationer might assert "that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate." (*Gagnon* v. *Scarpelli* (1973) *supra,* 411 U.S. 778, 790 [36 L.Ed.2d 656, 666].)

The Attorney General points to the burdens that the government would have to bear in granting parole revocation hearings in multiple jurisdiction cases, and argues, "In this case it is simply not convenient to give petitioner his revocation hearings. The federal prison officials have no obligation to release petitioner to California for such hearings, and even if they did release him, the cost of transporting him back to California would be very high."

Aside from the fact that governmental "convenience" is a fragile base upon which to construct an argument proposing to dispense with

---

[5]The Attorney General seeks to distinguish *Sutherland* and similar cases on the ground of lack of a multiple jurisdiction issue. The attempted distinction is not compelling. First of all, *Sutherland* did not rest on the fact that federal parole boards may more easily grant hearings to federal prisoners, but on the fundamental due process safeguards which must be accorded to any prisoner. But more importantly *Sutherland* specifically dealt with this issue and declared, "The mere fact that plaintiff is incarcerated far from the District of Columbia would not excuse such a delay *even if he were under state authority* ...." (Italics added.) (366 F.Supp. at pp. 272-273, fn.*.)

fundamental due process rights, it also appears clear that the interests of petitioner and the government can be accommodated in the instant case by the simple expedient of affording petitioner the opportunity to waive personal appearance at the revocation hearing. The Adult Authority could then conduct the hearing in absentia and determine whether to reinstate or revoke parole. With either result the petitioner would then be able to take steps to achieve the benefit of concurrency.[6]

Petitioner next contends that the delay of over two years from the time of his arrest on federal charges to the present precludes the Adult Authority from now conducting the hearing and revoking parole. Accordingly petitioner urges that he should be restored to parole status. The argument is without merit. The only conceivable prejudice petitioner has suffered from failure to afford a timely hearing is the loss of credit on the time he has served at McNeil Island. Such prejudice can be cured by restoring this credit if the Adult Authority ultimately decides to reinstate parole. If the Authority concludes that parole is to be revoked but petitioner is able to have a California institution designated as the place of service for the federal term, petitioner will also receive credit on his state term for the time served at McNeil Island unless the Adult Authority determines to its own satisfaction that the United States Attorney General would not have designated a California institution at an earlier time even if petitioner had been given a timely revocation hearing.

With respect to the parole violator warrant and attendant detainer, the Adult Authority would, of course, withdraw the warrant and request for notice if parole were reinstated. If parole is revoked, it is assumed the

---

[6]A similar claim of administrative hardship was made in *Gagnon* and rejected by the Supreme Court: "Petitioner [the warden] argues . . . that the *Morrissey* hearing requirements impose serious practical problems in cases such as the present one in which a probationer or parolee is allowed to leave the convicting State for supervision in another State . . . . . [¶] . . . Some amount of disruption inevitably attends any new constitutional ruling. We are confident, however, that modification of the interstate compact can remove without undue strain the more serious technical hurdles to compliance with *Morrissey*. An additional comment is warranted with respect to the rights to present witnesses and to confront and cross-examine adverse witnesses. Petitioner's greatest concern is with the difficulty and expense of procuring witnesses from perhaps thousands of miles away. While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence. Nor did we intend to foreclose the States from holding both the preliminary and final hearings at the place of violation or from developing other creative solutions to the practical difficulties of the *Morrissey* requirements." (411 U.S. at pp. 782-783, fn. 5 [36 L.Ed.2d at p. 662].)

request for notice would remain lodged as a detainer at McNeil Island and the present warrant would be exchanged for one designed to return petitioner to prison rather than to return petitioner for revocation proceedings.

The Attorney General's return informs us that the Adult Authority is presently devising procedures which will result in a mechanism for conducting hearings in other jurisdictions for parolees against whom a California detainer has been lodged. Certainly we do not intend to deter such efforts; we emphasize that nothing herein should be taken to indicate that a personal appearance is unnecessary, but only that it is a right which may be waived. One of the primary purposes of a revocation hearing is the opportunity for the parolee to appear and present evidence that either he did not commit the violation, or if he did, that there are mitigating circumstances militating against revocation of parole. (*Morrissey,* at p. 480 of 408 U.S. [at pp. 493-494 of 33 L.Ed.2d].) Consistent refusal to develop procedures for dealing with the problem of interjurisdictional *Morrissey* hearings might well have lent credence to the argument that excessive delay in providing a hearing was per se prejudicial.[7]

At minimum, however, we hold that due process requires that parolees incarcerated under intervening sentences be informed of the option of submitting a written waiver of personal appearance at the revocation hearing.[8] After such waiver, hearings in absentia shall be conducted promptly. This rule would apply only to those parolees whose whereabouts were known to the Adult Authority; in the usual case this will not present a problem, because the Adult Authority will have already lodged a detainer at their place of confinement.

[7]In *La Croix* we recognized "the very extensive changes in its practices which *Morrissey* and its progeny require of the Authority." We further noted that the Adult Authority was refusing to give prerevocation hearings at that time based on a good faith misinterpretation of *Morrissey.* (12 Cal.3d at p. 155, fn. 7.) Similar considerations surround the instant case. We have held that as regards this petitioner any prejudice flowing from the denial of a revocation proceeding can be cured by allowing him to waive personal appearance. We have been advised, however, that in the future the Adult Authority will develop a mechanism to more adequately deal with the multiple jurisdiction problem. (See, e.g., fn. 6, *ante.*) We thus do not reach the question of the extent to which a parolee incarcerated in another jurisdiction may demand the full panoply of rights mandated by *Morrissey.*

[8]In a closely analogous context, the right to request probation revocation in absentia is mandated by statute. (Pen. Code, § 1203.2a; *Hayes* v. *Superior Court* (1971) 6 Cal.3d 216 [98 Cal.Rptr. 449, 490 P.2d 1137].)

In the case before us petitioner may transmit to the Adult Authority his intention to waive personal appearance, if he chooses to do so. Upon receipt of the waiver the Adult Authority shall conduct a revocation hearing in petitioner's absence.

As the petitioner is entitled to no immediate relief, the order to show cause is discharged and the petition for writ of habeas corpus is denied.

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., and Burke, J.,* concurred.

CLARK, J.—I dissent from this unwarranted extension of *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593].

In *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778, 781 [36 L.Ed.2d 656, 661, 93 S.Ct. 1756], the United States Supreme Court succinctly restated the rationale of its decision in *Morrissey:* "[W]e held that the loss of *liberty* entailed [by revocation of parole] is a *serious deprivation* requiring that the parolee be accorded due process." (Italics added.) In *Morrissey* itself, the court referred to revocation of parole as inflicting a "grievous loss" on the parolee. (408 U.S. at p. 482 [33 L.Ed.2d at p. 495].)

Petitioner has been deprived of no *liberty* by California authorities; he has been imprisoned by federal authorities for a federal offense. Therefore, the question presented by this case is whether lodging the detainer resulted in some other "grievous loss" entitling petitioner to a revocation hearing prior to the expiration of his federal term.

This is, of course, a mixed question of fact and law. The factual question is whether the term or conditions of petitioner's confinement in federal prison are detrimentally affected by the California detainer. Assuming the answer to this threshold question is affirmative, the legal question is whether the effects of the detainer are *sufficiently* detrimental to constitute a "grievous loss" under *Morrissey*. Because of this court's failure to order a reference to resolve disputed issues of fact, the legal question cannot be resolved in this case.

The majority's failure to resolve the factual issues is revealed in the following passage: "[I]t is clear that the lodging of a detainer results in

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

cognizable detriment to petitioner. Petitioner enumerates the following purported adverse consequences of the detainer: (1) it precludes his application for choice work duty such as 'camp assignments' at which 'camp good time' can be earned; (2) it results in ineligibility for furloughs for work or school purposes and (3) ineligibility for federal 'parole to the community'; (4) it disrupts rehabilitative efforts since he has no way of ascertaining the ultimate length of his term if and when California executes the outstanding warrant. In addition, and perhaps most importantly, the failure of the Adult Authority to either revoke or reinstate parole has denied petitioner the benefit of concurrence which the federal sentence envisaged." (*Ante,* p. 715; fn. omitted.)

However, petitioner's allegations are disputed. His caseworker at the federal penitentiary denies under oath that the detainer renders petitioner ineligible for a minimum custody classification.[1] Moreover, the practical distinctions between "minimum" and "medium" custody classifications would have to be of record in order to reliably determine whether preclusion from minimum custody classification constitutes a "grievous loss."

The other factual allegations of the petition are also contradicted by the caseworker's affidavit. 1. Petitioner's medium custody classification—which, remember, is not due to the detainer—does make him ineligible for "camp assignment." However, the same amount of "good time" (five days per month) accrues from his work in prison industries, and a prisoner may not simultaneously participate in both programs. 2. "[T]here are no work furlough or school furlough programs available to any prisoner at McNeil Island, regardless of the existence or nonexistence of a detainer." 3. "[Petitioner] is not being denied 'parole to the community' by reason of the detainer lodged against him, because he

---

[1]The caseworker's affidavit states in pertinent part: "That Bernard A. Shapiro presently has a medium custody classification. [¶] That a detainer lodged against a prisoner at McNeil Island may prevent the prisoner from obtaining a minimum custody classification. [¶] That a prisoner at McNeil Island cannot be given a minimum custody classification so long as there is a detainer lodged against him which will probably result in a lengthy consecutive sentence in another institution. [¶] *That a prisoner at McNeil Island can be given a minimum custody classification, if he is otherwise eligible, when there is a detainer lodged against him which is not one that will probably result in a lengthy consecutive sentence in another institution.* [¶] *That the detainer lodged against Bernard A. Shapiro does not prevent him from being classified as minimum custody because* the arrest warrant which accompanies the request for sixty day's notice prior to release or transfer is, according to the instructions of the California Department of Corrections, sent only to assure that the prisoner is not released from custody prior to further action by the California Adult Authority, and, therefore, *this detainer is not one which will probably result in a lengthy consecutive sentence in another institution.*" (Italics added.)

can become eligible for parole only on the date of expiration of his term [11 January 1976], with credit for good time . . . and such date has not been nor will it be delayed because of the existence of the detainer."

Finally, it is also mere speculation for the majority to conclude petitioner is being denied "the benefit of concurrence which the federal sentence envisaged." (*Ante,* p. 715.) "Even where the federal court expressly recommends that the federal sentence run concurrently with a prior state sentence, the recommendation is viewed as surplusage under federal law, and the federal sentence is consecutive with the state sentence if the United States Attorney General does not designate the state prison as the place where the federal sentence is to be served." (*In re Gullatt* (1968) 69 Cal.2d 395, 397 [71 Cal.Rptr. 676, 445 P.2d 292].) No such designation has been made here.

I do not suggest that a reference is required whenever a prisoner subject to a detainer invokes *Morrissey*. To conserve judicial resources it might be appropriate to require revocation hearings in all such cases if this court were to determine—on an adequate record—that detainers usually, or even often, result in "grievous loss." However, no such determination can properly be made on the record before us.