[No. F005404. Fifth Dist. June 26, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERTO PAREDES ARCIGA, Defendant and Appellant.

[No. F005843. Fifth Dist. June 26, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
GUADALUPE DIAZ, Defendant and Appellant.

**COUNSEL**

Alice T. Jefferson and Linda Stoick, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Shirley A. Nelson, Eddie T. Keller and Eileen Ceranowski, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WOOLPERT, J.**—This appeal is a consolidated action brought by two Mexican nationals who illegally entered California and later were convicted of narcotic offenses in separate proceedings. After each man was sent to the California Rehabilitation Center (CRC), the Director of Corrections (Director) found them unfit for narcotics abuse treatment and returned them to court for further criminal proceedings. They were rejected because each was an "illegal" and Immigration and Naturalization Service (INS) "holds" had been placed on them.

 Sixteen years ago the court in *People* v. *Hernandez* (1970) 10 Cal.App.3d 646 [89 Cal.Rptr. 192], determined the pendency of deportation proceedings is an adequate grounds for rejecting a defendant from the program. Arguments of counsel notwithstanding, we find the law remains the same.

Only a brief summary of the background and facts of each defendant's case is necessary. Defendant[1] Diaz appeals from the judgment in two cases out of Merced County, and defendant Arciga appeals from a judgment from Kings County.

Diaz was found guilty of violating Health and Safety Code sections 11350 (possession of heroin) and 11352 (sale of heroin). Arciga pled guilty to twice violating Health and Safety Code section 11352. Each defendant was sentenced to a prison term, but upon review of petitions filed pursuant to

---

[1]For convenience, Diaz and Arciga will be referred to as defendants or patient-inmates.

Welfare and Institutions Code section 3050,[2] criminal proceedings were suspended due to the finding of drug addiction or the danger of becoming addicted. Both were committed to CRC.

Pursuant to section 3053, each defendant was later found to be unamenable for the reasons previously stated. Criminal proceedings were reinstated and the prison sentences were ordered executed.

## THE ISSUE

We can best summarize the issue by paraphrasing an introduction used by one of the defendants. He was arrested after two sales of heroin; small amounts were involved. At the time, he was on probation "for an unrelated offense, possession of heroin . . . ." Conceding addiction, he claims selling "only to support his habit." His wish is "to be placed in CRC so that he can kick his habit and acquire skills that will help him support his family." He admits to being an illegal alien and having illegally returned to the United States several times after being deported. Prior to conviction for his present crimes, he lived with his wife and two children in Merced. He successfully participated in the addicts' program for six months prior to rejection.

Admitting to these facts of use and multiple illegal entries, he states the issue as follows: "In the present case, the trial court abused its discretion by failing to scrutinize and overturn the decision of the director of CRC to exclude Appellant from the Civil Addicts Program. The director of CRC has abused his discretion by assuming that the Appellant would in fact be deported and denied Appellant equal protection and due process of laws by basing the decision solely upon Appellant's status as an alien."

Although considered an involuntary program for purposes of constitutional review, CRC often becomes a preferred postconviction alternative to prison. No longer is there the risk of confinement longer than the prison penal term. With the expected outpatient portion of the treatment program to occur relatively soon, it offers the potential for both a medical cure and early freedom. Therefore, it is not surprising our two defendants strongly argue their termination was arbitrary, particularly because they contend their brief time at CRC established suitability.

Contrary to the position taken by defendants, we believe the issue is better stated as follows: "May an addict be denied rehabilitative care and treatment

---

[2]All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

if the Director determines the outpatient portion of the program is likely to be interrupted prior to the patient-inmate's 'cure' and safe return to society?'' So stated, the focus of our inquiry shifts to the program's purposes, and the effect of multiple factors which the Director must consider in such cases. Citizenship of the patient-inmate is then reduced to but one of those factors.

## PROGRAM PURPOSES

Section 3000 provides: "It is the intent of the Legislature that persons addicted to narcotics, or who by reason of repeated use of narcotics are in imminent danger of becoming addicted, shall be treated for such condition and its underlying causes, and that such treatment shall be carried out for nonpunitive purposes not only for the protection of the addict, or person in imminent danger of addiction, against himself, but also for the prevention of contamination of others and the protection of the public. Persons committed to the program provided for in this chapter who are uncooperative with efforts to treat them or are otherwise unresponsive to treatment nevertheless should be kept in the program for purposes of control. It is the further intent of the Legislature that persons committed to this program who show signs of progress after an initial or subsequent periods of treatment and observation be given reasonable opportunities to demonstrate ability to abstain from the use of narcotics under close supervision in outpatient status outside of the rehabilitation center provided for in Chapter 2 (commencing with Section 3300) of this division. Determinations of progress of persons committed to the program should be based upon criteria to be established by the director of Corrections with the advice of clinically trained and experienced personnel.

"The enactment of the preceding provisions of this section shall not be construed to be evidence that the intent of the Legislature was otherwise before such enactment." (§ 3000.)

The importance of the outpatient participation phase is clear: "It is readily apparent that the Legislature intended to treat an outpatient as someone who is recovering from an illness. The purpose of the narcotic addict commitment program is not only to effect a temporary 'cure' of the patient's addiction, but to rehabilitate him. [Citations.] 'Experience with past programs of this nature has shown that a lack of followup supervision results in a high rate of relapse. [Citations.] The present "parole" (outpatient) system is designed to overcome this defect by providing the necessary followup through counseling, testing for narcotic use, and immediate return for further treatment if a relapse should occur. As pointed out in *In re De La O* (1963) *supra,* 59 Cal.2d 128, 145, "These rules appear to be designed to meet the particular

needs of an addict in the later stages of the process of rehabilitation."' (*In re Trummer* [(1964)] 60 Cal.2d at p. 661 [36 Cal.Rptr. 281, 388 P.2d 177].)" (*People* v. *Myers* (1972) 6 Cal.3d 811, 817 [100 Cal.Rptr. 612, 494 P.2d 684].)

### STANDARD OF REVIEW

Section 3053 provides in pertinent part: "(a) If at any time following receipt at the facility of a person committed pursuant to this article, the Director of Corrections concludes that the person, because of excessive criminality *or for other relevant reason,* is not a fit subject for confinement or treatment in such narcotic detention, treatment and rehabilitation facility, he shall return the person to the court in which the case originated for such further proceedings on the criminal charges as that court may deem warranted." (Italics added.)

We will assume the Director used the INS hold as an "other relevant reason" for returning each patient-inmate to the court.

Courts often find it appropriate to defer to medical judgments based upon relevant facts. The diagnosis of narcotics addiction, the appropriateness of treatment, and the ultimate opinions of cure and safe release are particularly matters involving expertise. Our state Supreme Court has referred to this deference in both aspects of the CRC program. On the entry side, the high court quoted the following from *People* v. *Marquez* (1966) 245 Cal.App.2d 253, 256-257 [53 Cal.Rptr. 854]: "Thus 'whether or not any given defendant can be treated with success is a fact which, in the last analysis, must be determined not by judges but by people trained in that field and actually engaged in the treatment process. Hence, out of practical necessity, the statute leaves to the professional experts the final decision on whether or not treatment should be begun or be continued.' (*People* v. *Marquez* (1966) 245 Cal.App.2d 253, 256-257 [53 Cal.Rptr. 854].)" (*In re Marks* (1969) 71 Cal.2d 31, 40, fn. 6 [77 Cal.Rptr. 1, 453 P.2d 441].) The *Marks* court found the same rule of deference applicable to release conditions. (*Ibid.*)

■ However, the trial court's authority to conduct the review "is not unfettered." (*People* v. *Morgan* (1971) 21 Cal.App.3d 33, 39 [98 Cal.Rptr. 165].) Generally, the expert judgment is free from attack unless the facts upon which it depends are shown to be nonexistent or have no legal relevance to the patient-inmate's fitness to remain in the program. "Once it is established that relevant reasons in fact exist the question of whether or not they are so serious as to require rejection from the program is for the director and not for the court." (*People* v. *Toscano* (1977) 69 Cal.App.3d 140, 152 [137 Cal.Rptr. 893].)

Because of the "deferential abuse-of-discretion" standard of judicial review, the Director is required to provide the patient-inmate with certain due process rights. (*People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622].) These rights are somewhat limited because the Director's decision is "evaluative in nature and based on his specialized subjective judgment; that judgment depends on consideration of a host of intangible factors rather than on the existence of particular and contestable facts." (*Id.*, at p. 275.) The *Ramirez* requirements are designed to help assure the Director acts upon valid information.

### OTHER RELEVANT REASONS

One authority has characterized "other relevant reasons" recognized by the courts: "(1) an escape risk, (2) a confirmed and aggressive sexual deviate, (3) mentally ill or defective, (4) senile, (5) handicapped by a language barrier, (6) an arsonist, or (7) one who 'has been previously exposed to therapy and rehabilitation programs without significant gains.'[250]" (Belton, *Civil Commitment of Narcotics Addicts In California: A Case History of Statutory Construction* (1968) 19 Hastings L.J. 603, 652.)

Footnote 250 of the quoted passage provides: "[250]Attachment to letter from Walter Dunbar, Director of Corrections, dated September 6, 1966, printed as appendix to Alternative Disposition for the Narcotic Addict, address by Roland W. Wood, Superintendent of the California Rehabilitation Center, Sentencing Institute for Superior Court Judges, March 17-18, 1967."

Our research has uncovered additional relevant reasons: character defect (*People* v. *Hankins* (1982) 137 Cal.App.3d 694, 698, fn. 6 [187 Cal.Rptr. 210]); use of drugs while on release (*People* v. *Blackwell* (1975) 45 Cal.App.3d 804, 810-811 [119 Cal.Rptr. 768]); recent violence and proven gang affiliation (*People* v. *Garcia* (1978) 78 Cal.App.3d 247, 249 [144 Cal.Rptr. 176], cert. den. 439 U.S. 873 [58 L.Ed.2d 186, 99 S.Ct. 208]); escape and absence for a period of one year (*People* v. *Quintana* (1977) 69 Cal.App.3d 178, 180 [138 Cal.Rptr. 1]); inability to participate due to marginal intelligence and unwillingness (*People* v. *Marquez, supra,* 245 Cal.App.2d at p. 257).

In *People* v. *Hernandez, supra,* 10 Cal.App.3d 646, an INS detainer was placed on the patient-inmate after the court found him eligible for CRC. The trial court denied his application for judicial recommitment and sentenced him to prison. (*Id.*, at p. 646.) In affirming the judgment, the *Hernandez* court held: "[P]ending deportation would clearly relate to the party's 'fitness for "confinement or treatment in a rehabilitation facility,"' within

the standard of *People* v. *Hannagan* [(1967)] 248 Cal.App.2d 107, 111 [56 Cal.Rptr. 429], since the program depends on continued availability for treatment. Also pending deportation would effect the party's ability 'to participate either in the educational or therapeutic programs at the rehabilitation center,' within the standard of *People* v. *Marquez, supra,* 245 Cal.App.2d 253, 257, since obviously defendant would not be able to participate in programs at the rehabilitation center when he is deported. The rehabilitation program contemplates an extended period of institutional and outpatient treatment. The law contemplates a seven-year commitment, and a minimum of six months spent as an inpatient, with the addict then being placed on outpatient status (Welf. & Inst. Code, §§ 3151, 3152, 3201), and pending deportation makes this program impossible. Clearly it is a relevant reason for a person's return." (*Hernandez, supra,* at p. 649.) The court also analogized an INS detainer to a hold placed on a patient-inmate whose parole has been cancelled. A finding that parole revocation constitutes an "other relevant reason" has been upheld on appeal. (*Id.,* at pp. 649-650.)

In *People* v. *Hames* (1975) 54 Cal.App.3d 40 [126 Cal.Rptr. 459], the same court which wrote *Hernandez* held a detainer placed upon a defendant by a sister state was a sufficiently relevant reason to warrant exclusion from CRC. (*Id.,* at pp. 42, 44.) The court was not impressed by the fact the out-of-state detainer was later withdrawn. It was enough that the hold existed at the time the Director used it as the sole reason for exclusion. (*Id.,* at p. 44.) Again, as in *Hernandez,* the court examined the accuracy of the facts before the Director and found no abuse of discretion.

Here, it is uncontroverted the holds were properly placed. We cannot presume the Director, when reviewing these cases, considered the holds with complete disregard for the totality of the circumstances involved, including the "offense and offender." Instead, we presume the Director considered the illegal alien status only as it related to successfully completing the entire program. The *Hernandez* court made the same assumption. (See, e.g., *People* v. *Superior Court (Martin)* (1982) 132 Cal.App.3d 658, 665 [183 Cal.Rptr. 563].)

Whether a patient-inmate will be in the country during the noncustodial outpatient period has an obvious relevance to the viability of the program. In this case and many others, deportation is not a matter of certainty, but one of probability. Whether the Director properly may emphasize the likelihood of deportation would depend on where a given case fits along this spectrum of probability. Certainly a bare possibility of deportation, as in the case of a legal alien, would be too speculative to deserve serious consideration. Similarly, the fact of certain deportation would be crucial.

In the present case, we are faced with circumstances presenting a number of factors, some being more relevant to fitness than others. We begin with alienage, proceed to illegal alien status, then to the consideration of the commission of one or more deportable offenses, and finally find ourselves faced with placement of an INS hold.

The importance of the INS holds in these consolidated cases, however, is not to be minimized. Parole "holds," for example, have been a familiar event in criminal law practice. A hold constitutes "advice" from one agent with authority to another such agent. The "advice" is an expression of an intent to exercise a governmental right to the physical custody of the defendant at the earliest proper time. (*In re Law* (1973) 10 Cal.3d 21, 24 [109 Cal.Rptr. 573, 513 P.2d 621].) It has serious consequences, including the refusal of bail in some cases. (*Id.*, at p. 26.)

In California, the Supreme Court has noted the adverse consequences of parole revocation detainers, including the effect on rehabilitation efforts. Therefore, an inmate facing parole revocation has been afforded a limited opportunity to require the Adult Authority to conduct revocation hearings with due diligence while the current confinement continues, instead of awaiting release from present commitment. (*In re Shapiro* (1975) 14 Cal.3d 711 [122 Cal.Rptr. 768, 537 P.2d 888].)

An INS "hold" usually appears in the form of a notice to the present custodian that the defendant or inmate is subject to deportation. The custodian is asked to accept the notice as a detainer, and requested to notify the INS prior to release "in order that a decision could be made as to whether appellant would be placed under deportation proceedings." (*Argiz* v. *United States Immigration* (1983) 704 F.2d 384, 386.)

In the *Argiz* case we find facts and contentions similar to those in the present case. Argiz entered the United States fraudulently, a fact the United States Supreme Court has treated as entry without inspection. (*Reid* v. *INS* (1975) 420 U.S. 619 [43 L.Ed.2d 501, 95 S.Ct. 1164].) Argiz was sentenced to a six-year prison term for robbery. He contended an INS detainer placed against him adversely affected his rehabilitation program. He sought relief under the constitutional right to speedy trial, and pursuant to the Interstate Agreement on Detainers. (18 U.S.C. appen. § 2, art. III(a); see §§ 1389-1389.8 for the codification of the agreement in California.)

The court found no Sixth Amendment violation and no statutory basis for relief—the INS hold not being notice of *pending criminal charges* in another jurisdiction. California similarly interprets the detainer statute. (*In re Gilchrist* (1982) 134 Cal.App.3d 867, 870 [184 Cal.Rptr. 861].)

Argiz also argued violations of his rights to due process and equal protection because "he must endure the discriminatory adverse effects of the detainer on his institutional status and rehabilitation program throughout the period of his confinement." (*Argiz* v. *United States Immigration, supra,* 704 F.2d 384, 388.) Federal law provides the alien is not to be deported until the current imprisonment has been terminated. (8 U.S.C. § 1252(h).) However, as the court noted in dictum, the statutes "do not permit the Attorney General to defer a final determination on deportation merely because an alleged alien is confined and may not actually be deported until release. His statutory duty is to proceed with 'reasonable dispatch' to determine whether appellant is deportable." (*Argiz, supra,* at pp. 388-389.) Placement of a hold, therefore, is nothing more than a minimal fulfillment of this duty, despite the fact it may stay with the inmate throughout his period of incarceration.

■ The pendency of deportation proceedings places the state court in a secondary position in terms of continued control over an illegal alien: "[U]nder the supremacy clause, Congress has preempted the field of immigration. . . . [I]n the absence of a limitation, the states are *bound* by it to enforce violations of the federal immigration laws." (*People* v. *Barajas* (1978) 81 Cal.App.3d 999, 1006 [147 Cal.Rptr. 195].) Our state legislature has recognized the important problem of narcotic abuse by illegal aliens and the need to cooperate with federal authorities: "When there is reason to believe that any person arrested for violation of [certain uniform controlled substances sections] may not be a citizen of the United States, the arresting agency shall notify the appropriate agency of the United States having charge of deportation matters." (Health & Saf. Code, § 11369.)[3]

In *Shapiro, supra,* 14 Cal.3d 711, the California agency which the court required to provide an accelerated parole revocation proceeding was subject to the full authority of the court. In contrast, if a defendant or inmate confined in a California prison or hospital wishes to expedite the immigration proceedings, his remedy lies with federal administrative and judicial authorities.

In some cases, limited state court contribution may be made to the immigration decision. Federal statutory authority allows the state sentencing court to make a recommendation against deportation. (8 U.S.C. § 1251(b)(2).) "[T]he United States Congress did not intend that the sentencing court consider rehabilitation but did intend that the sentencing court

---

[3]Similarly, "[t]he State Department of Mental Health shall cooperate with the United States Bureau of Immigration in arranging for the deportation of all aliens who are confined in, admitted, or committed to any state hospital." (§ 4118.)

consider the nature of the crime and then surrounding circumstances, including the present and past record of the defendant. . . ." (*People* v. *Borja* (1981) 125 Cal.App.3d 758, 763 [178 Cal.Rptr. 287].)

However, even this input is limited in narcotics cases. Section 1251(b)(2), 8 United States Code, excepts from its application any alien who is charged with being deportable under 8 United States Code section 1251(a)(11), which broadly refers to drug addicts and those who are convicted of possessing or trafficking in illegal drugs and associated substances.

Other areas of federal law reflect a policy against allowing completion of state narcotic rehabilitation programs by addicted aliens. Although federal immigration authorities cannot deport an illegal alien until the imprisonment is terminated, "[p]arole, probation, or possibility of rearrest or further confinement in respect of the same offense shall not be a ground for deferral of deportation." (8 U.S.C. § 1252(h).) The California procedure of suspending proceedings and placing the defendant on probation will not avoid this consequence: the plea of guilty or a finding of guilt which is in repose is treated as a conviction by federal authorities. Thus the defendant on "probation," howsoever affected, will be subject to federal custody detainers. (*Gutierrez* v. *Immigration and Naturalization Service* (1963) 323 F.2d 593, cert. den. 377 U.S. 910 [12 L.Ed.2d 179, 84 S.Ct. 1171].)

The significance of the INS holds in the present case is even greater when viewed in conjunction with the nature of the offenses committed and the potential or actual addiction involved. In summary, therefore, we find the trial court was correct. The Director did not abuse his discretion in concluding the defendants were unlikely to complete the outpatient CRC program. As a result, under the circumstances before CRC and the sentencing courts, as to each defendant, there was no abuse of discretion.

### Equal Protection

We need not reach the question of whether a hold based on alienage created an unconstitutional classification. Both patient-inmates were rejected for medical reasons based upon the totality of the circumstances presented in each of their respective cases. Alienage was but one factor existing in the circumstances upon which the decision to reject was based.

Nevertheless, we note article I, section 7, of the California Constitution, and the Fourteenth Amendment of the United States Constitution, require individuals similarly situated with respect to the law be treated the same. Legal aliens have been held to constitute a "discrete and insular minority" and a suspect class afforded the protection of strict scrutiny whether or not

a fundamental right is impaired by government action. (*Graham* v. *Richardson* (1971) 403 U.S. 365, 372, 376 [29 L.Ed.2d 534, 541-542, 91 S.Ct. 1848].)[4]

However, in *Plyler* v. *Doe* (1982) 457 U.S. 202 [72 L.Ed.2d 786, 102 S.Ct. 2382], the United States Supreme Court applied its standard of intermediate scrutiny to the challenge made by the children of illegal aliens. Under the challenged state laws, the children, who were also illegal aliens, could not attend public schools in Texas. (*Id.*, at pp. 206, 210 [72 L.Ed.2d at pp. 792-793, 794-795].) Significantly, the court in *Plyler* made the following statement: "We reject the claim that 'illegal aliens' are a 'suspect class.' No case in which we have attempted to define a suspect class, see, *e.g.*, n. 14, *supra*, has addressed the status of persons unlawfully in our country. Unlike most of the classifications that we have recognized as suspect, entry into this class, by virtue of entry into this country, is the product of voluntary action. Indeed, entry into the class is itself a crime. In addition, it could hardly be suggested that undocumented status is a 'constitutional irrelevancy.' With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation. No State may independently exercise a like power. But if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction. See *De Canas* v. *Bica*, 424 U.S. 351 (1976)." (*Plyler, supra,* at p. 219, fn. 19 [72 L.Ed.2d at pp. 800-801].)

It is questionable, therefore, whether strict scrutiny would be applied in this case even if the patient-inmates were rejected solely because of their illegal alien status.

OTHER CONSTITUTIONAL ISSUES

■ Arciga also argues he was denied effective assistance of counsel. Trial counsel allegedly failed to argue Arciga was not afforded all of his due process rights as required by *People* v. *Ramirez, supra,* 25 Cal.3d 260.

---

[4]"In subsequent cases, the Supreme Court has somewhat wavered in its view that alienage classifications are suspect. In a recent case the court has explained that 'restrictions on lawfully admitted aliens which affect economic interests are subject to heightened judicial scrutiny.' (*Cabell* v. *Chavez-Salido* (1982) 454 U.S. 432, 439 [70 L.Ed.2d 677, 102 S.Ct. 735, 739].) However, the exclusion of aliens from political or governmental functions has been upheld without application of strict scrutiny. (See, e.g., *Ambach* v. *Norwick* (1979) 441 U.S. 68 [60 L.Ed.2d 49, 99 S.Ct. 1589]; *Foley* v. *Connelie* (1978) 435 U.S. 291 [55 L.Ed.2d 287, 98 S.Ct. 1067].)" (*Darces* v. *Woods* (1984) 35 Cal.3d 871, 891, fn. 22 [201 Cal.Rptr. 807, 679 P.2d 458]; see also Nowak et al., Constitutional Law (2d ed. 1983) Limitations on Government Power, § III, p. 424.)

The *Ramirez* court held a patient inmate was entitled, as a matter of due process, to a meaningful opportunity to respond to the grounds for exclusion before the final exclusion takes place. A meaningful opportunity to respond included: (1) receipt of a statement of grounds for exclusion; (2) access to information used by the director in reaching his decision; (3) notice of the right to respond; (4) the right to respond orally before a responsible official if the patient inmate so chooses; and (5) a written statement of final decision with reasons. (*People* v. *Ramirez, supra,* 25 Cal.3d at pp. 275-276.)

Appellate counsel misreads the record. Trial counsel was concerned with the written statement from CRC indicating Arciga's case was considered "in absentia." However, the *Ramirez* decision does not require "presence" at the time the final exclusion decision is made, only a right to meaningfully respond to the grounds for exclusion. Arciga presented no evidence showing he was not offered the opportunity to exercise the rights afforded him by *Ramirez.* Therefore, for purposes of this appeal, we must conclude the court was correct in ruling Arciga failed to carry his burden of proof on the *Ramirez* issue. If additional facts exist supporting Arciga's position, they are better reviewed by writ of habeas corpus.

We affirm the judgment in each case.

Hanson (P. D.), Acting P. J., and Hamlin, J., concurred.